**Dr. Joseph CARPENTER,
Plaintiff-Appellant,**

v.

**BOARD OF REGENTS OF the
UNIVERSITY OF WISCONSIN
SYSTEM, Defendant-Appellee.**

**No. 83-1243.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 19, 1983.

Decided Feb. 23, 1984.

Jeff Scott Olson, Julian & Olson, S.C., Madison, Wis., for plaintiff-appellant.

John R. Sweeney, Wis. Dept. of Justice, Madison, Wis., for defendant-appellee.

Before CUDAHY and FLAUM, Circuit Judges, and DUMBAULD, Senior District Judge.*

PER CURIAM.

Dr. Joseph Carpenter brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, after he was denied tenure at the University of Wisconsin-Milwaukee ("UW-M"). He alleged that he was denied tenure, and consequently fired, because of his race, black. The case was tried without a jury on both disparate treatment and disparate impact theories,

---

* Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

the disparate impact theory having been introduced only on the first day of the trial. The disparate treatment claim was dismissed at the close of the plaintiff's case and, after the trial, judgment was entered for defendant on the disparate impact claim. On appeal, Dr. Carpenter challenges only the adverse judgment with respect to the disparate impact claim. Because we find none of the factual findings of the district court to be clearly erroneous and, further, no legal errors appear in the record, the judgment is affirmed.

## I. Background

The factual and historical circumstances leading to this litigation are described in admirable detail in the district court's seventy-one pages of findings. In fact, the district court's findings enlighten us thoroughly both on the history of the Afro-American Studies Department ("AASD" or the "Department") at UW–M and on the mechanics of obtaining academic tenure. Without in any way depreciating the value of extensive findings in facilitating appellate review, we will attempt to be more brief.

Carpenter was appointed to a tenure track position at UW–M in AASD in 1972. Carpenter had been awarded his Ph.D in 1970 by Marquette University and from 1970 until his appointment at UW–M he served as an assistant professor and director of Afro-American Studies at Carthage College in Kenosha, Wisconsin. Although he had job offers at six other colleges and universities, Carpenter accepted the position at UW–M because he did not want to uproot his family from Milwaukee.

AASD was a relatively young department when Carpenter joined it. The Department was first established as the Afro-American Studies Center in 1969, largely due to pressure from the black student community to recognize the importance to our society of black culture and history. The Center offered several courses for credit but was also envisioned as a place to provide support services for black students and to serve as a black cultural center for the Milwaukee community. The conversion of the Center to an academic department in 1971 required a narrowing of the mission of the Center so that it could concentrate primarily on academic matters. However, UW–M maintained its policy of hiring only blacks as faculty members of AASD.

When Carpenter was appointed to the Department he was informed of the three-pronged test for achieving tenure at UW–M: the candidate must achieve a minimal level of competence and demonstrate a reasonable likelihood of future growth and performance in teaching, in research and scholarly writing and in service to the university community and to the larger community. At UW–M, as is apparently the case at most universities in the United States, faculty members were considered for tenure by the end of the seventh year of service. Because of certain peculiarities of Wisconsin law which required a full year's notice before termination, in practice a candidate was required to submit materials for tenure after five and a half years of service. At UW–M, if a faculty member failed to achieve tenure by the end of the seventh year, the faculty member was terminated.

The district court found that the three-pronged tenure test at UW–M, in the context of the seven year time rule, was not intended to discriminate against blacks. This finding is not challenged on appeal. The district court further found that UW–M did not foresee that the tenure practices might have a disparate impact on blacks or, more specifically, on black junior faculty at the AASD. In fact, the seven year rule was promulgated by the American Association of University Professors to protect its members from the possibility of delays in tenure decisions that could result in negative decisions occurring too late in a professor's career to allow a start at a new position. The district court also found that the three areas of competence covered by the test were related to the fulfillment of the basic function of the university.

The relative newness of the Department created significant additional responsibilities for Carpenter that were not borne by faculty members of other, more established,

departments. For instance, Carpenter was required to do extensive work in curriculum development and even had to develop courses outside his areas of expertise. Further, the young age of the Department apparently required Carpenter to assume much heavier administrative duties than junior faculty in other departments. In fact, Dr. Carpenter served as Chairman of the AASD for the academic year 1975–76.

The position of the Department in the black community also contributed to Carpenter's increased responsibilities. The district court found that the special needs of black students in the predominantly white UW–M community required Carpenter to engage in a higher level of counselling and advising activities than young professors in the well-established, "white", departments. Carpenter also took it upon himself, admirably, to participate in community service activities such as membership on the Milwaukee Board of Election Commissioners and service for a neighborhood association.

These activities, some forced on Carpenter because of the absence of senior faculty and established courses at AASD, some caused by unique problems of black students at a predominantly white university and some voluntarily undertaken by him apparently curtailed the time available to him for scholarly work, one of the three areas in which proficiency was required to attain tenure. Carpenter, in 1974, requested that one or two years of his prior service be eliminated from the time counted toward tenure so he could defer his tenure application beyond the 1975–76 academic year when it would normally be made. This request was refused, purportedly because university regulations allowed no discretion as to the time when a faculty member must apply for tenure. We must presume, because of the negative finding below on the disparate treatment claim, that any increased responsibilities Carpenter had were not "heaped" upon him as part of a scheme to prevent black professors from gaining tenure.

Carpenter prepared his tenure materials for submission in accordance with universi-

ty regulations. The materials were submitted to the AASD executive committee in early December, 1975 and the executive committee, on December 15, 1975, recommended to the Dean's office that tenure be granted. William Halloran, Dean of the College of Letters and Science (the "College"), of which AASD was a department, transmitted the recommendation to the executive committee of the Division of Professions. The latter committee unanimously recommended Carpenter be granted tenure.

After the executive committee of the Division of Professions made its recommendation, Carpenter's tenure application went back to the Dean's office for review. An associate dean, Nason Hall, was first to review the materials, and he advised his superior, Halloran, to review the submissions carefully because he thought there "was a problem." Halloran, after reading the materials, agreed that deficiencies in Carpenter's scholarly writing precluded him from supporting the application for tenure. Without going into detail, the record amply supports the district court's finding that Halloran, in good faith, felt that "the materials submitted as evidence of research and scholarship were not of sufficient quality to support a recommendation for Carpenter's tenure." Halloran, at the same time, considered Carpenter's record of teaching and service acceptable.

Without support from Halloran, Carpenter's application for tenure was effectively denied. Carpenter unsuccessfully appealed Halloran's decision to the top of the University of Wisconsin System. He also filed charges with the Wisconsin Equal Rights Division, the Equal Employment Opportunities Commission ("EEOC"), the Civil Rights Division of the Department of Health, Education and Welfare and the Office of Federal Contract Compliance Programs ("OFCCP") of the Department of Labor. Each of these agencies concluded that probable cause existed to believe that Carpenter's race was a factor in the tenure decision. The OFCCP concluded that Carpenter was a victim of disparate treatment. After receiving his right-to-sue letter from the EEOC, Carpenter brought this suit.

## II. *Discussion*

As noted, this suit was brought under both the disparate treatment and disparate impact theories of race discrimination. The district court held that Carpenter failed to prove his disparate treatment case; that finding is not challenged. The plaintiff claimed, however, that the district court erroneously failed to find that application of UW–M's three part tenure requirements (and the seven year rule) illegally made it more difficult for blacks to attain tenure.

In order to prevail on his "disparate impact" claim, Carpenter would have had to prove that the tenure requirements resulted in a disproportionate failure rate for black applicants. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If he succeeded in proving this prima facie case, UW–M would then be required to prove that the tenure requirements were job related. *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375. If UW–M showed job relatedness then "it remain[ed] open to [Carpenter] to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' Such a showing would be evidence that the employer was using its tests merely as a 'pretext' for discrimination." *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375 *quoting McDonnell Douglas Corp. v. Green,* 411 U.S. at 801, 804–05, 93 S.Ct. at 1823, 1825 (citation omitted).

Under the leading Supreme Court decisions on the subject, it is difficult to see how the district court could have found for Carpenter on a disparate impact theory. We have not found record evidence that would support a finding that blacks at UW–M were disproportionately denied tenure. Carpenter claims that such a disparate impact was proven by non-statistical, qualitative evidence. He claims his evidence shows it was "inevitable that the University's facially neutral tenure standards would have a disparate impact" on blacks because of the "many additional burdens in the teaching and service areas borne by the black Afro-American Studies junior faculty . . . ." Appellant's Reply Brief at 4. While a court may, in an appropriate case, project a disparate impact from non-statistical evidence, *see Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), in this case we are not confident that such a racial effect would necessarily have occurred. We could only speculate that new departments with white faculties are not burdened in some comparable fashion or that employment of the usual tenure requirements would "inevitably" result in proportionately fewer blacks receiving tenure. In any event, we are unpersuaded that the district court's refusal to accept a disparate impact approach here was erroneous.

Even if we were to find that the evidence supported a finding of disparate impact, there is no question that UW–M has a legitimate business interest in ensuring that its tenured professors are competent in the three competency areas. Therefore, we have no difficulty in agreeing with the district court's conclusions that the tenure standards, as employed, are "job related." We further conclude, because Carpenter did not present evidence that different tenure standards would adequately serve UW–M's business interests, that no showing has been made that the tenure standards are a "pretext" for race discrimination.

We are left with the problem of the seven year rule. The district court found that UW–M's interests in competent tenured faculty could have been served just as well if tenure decisions were made later than the seventh year of service. Carpenter argues that the increased burdens borne by junior faculty in AASD were attributable to the racial characteristics of the faculty and clientele and that these increased burdens made it impossible for him to meet the scholarship competency requirement within seven years. In fact, in October, 1982, the executive committee of AASD recommended that the Dean grant leaves of absence to two black tenure track junior faculty so their "tenure clock" would stop running temporarily. The reason given for this request by the committee was that the

faculty members "have had to face unusual difficulties during their probationary period as young black faculty members, given the range of countervailing pressures upon them." District Court Finding No. 369.

But the district court found a fatal flaw in Carpenter's argument concerning the seven year rule: Carpenter did not prove that his failure to achieve the required level of scholarly competency was due to the application of the seven year rule. The district court viewed this as an essential element of the case: Carpenter had to prove that his failure to achieve tenure was due to the disparate impact of the seven year rule. We find the absence of proof on the amount of time left to Carpenter for scholarly work to be particularly disturbing. Perhaps the apparent lack of proof is due to the lateness of the decision to add the disparate impact theory to the case. In any event, Carpenter had not proven that the additional demands on his time materially diminished his capacity to demonstrate the required competency in scholarship. The record does not disclose that Carpenter lacked adequate time within the tenure period to prove himself a scholar. Therefore, we cannot conclude that Carpenter has met his burden of showing that the seven year rule had a disparate impact on him because of his race.

We agree with the district court that a plaintiff in a disparate impact case must show that he or she was really injured by the policy alleged to have had a disparate impact. For example, a plaintiff denied a promotion could not challenge a promotion test as discriminatory, if promotion was denied for a reason completely unrelated to the test, such as lack of experience. Here, the district court determined that Carpenter failed to prove that any tendency to discriminate inherent in the seven year rule or the tenure standards really affected him. He simply failed to prove that the practices of which he complained had the discriminatory effect of which he complained. Even if the refusal to waive the seven year rule may appear overly strict, on these facts Title VII provides no remedy.

This case would be more difficult if we were presented with a record which illustrated in detail the extra demands placed on Carpenter's time because he is black. However, we have no idea how much time was available for scholarly work and how much time similarly situated white professors had available. We cannot conclude, on this record, that UW–M impeded Carpenter's quest for tenure because of his race or that there was not enough time left over to achieve the competency necessary to achieve tenure. For us to conclude that UW–M should have granted tenure would be to "replac[e] [the] university's judgment about academic employment with judgments made by the judiciary." *Davis v. Weidner,* 596 F.2d 726, 731 (7th Cir.1979). When presented with an appropriate case, we may be required to make such judgments, but this is not the case.

For the reasons expressed above, we affirm the judgment of the district court.