**Darlene SHIDAKER, Plaintiff,**

v.

**William BOLGER, in his capacity as Postmaster General (United States Postal Service), Defendant.**

**No. 82 C 5635.**

United States District Court, N.D. Illinois, E.D.

Aug. 23, 1984.

Richard M. Stanton, Joseph M. Burns, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for plaintiff.

Bill Hedrick, Elizabeth Landes, Asst. U.S. Attys., Chicago, Ill., for defendant.

## FINDINGS OF FACT—CONCLUSIONS OF LAW AND ORDER

WILLIAM T. HART, District Judge.

Plaintiff Darlene Shidaker ("Shidaker") sued her employer William Bolger in his capacity as Postmaster General of the United States Postal Service ("Postal Service"). Count I alleges discriminatory failure to promote under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 and 39 U.S.C. § 409. Count II seeks review of an administrative appeal of Shidaker's reduction in grade by the Postal Service. Plaintiff alleges that the reduction was in retaliation for her attempt to vindicate the alleged discriminatory failure to promote. Judicial review of the entire administrative record of Shidaker's reduction in grade is limited to determining whether the Postal Service's ostensible reason for the grade reduction, Shidaker's alleged poor performance, is supported by substantial evidence and was not arbitrary or capricious. *Coffman v. Bolger*, 590 F.2d 1366 (5th Cir. 1979); *Alsbury v. United States Postal Service*, 530 F.2d 852 (9th Cir.), *cert. denied* 429 U.S. 828 (1976); *Oates v. United States Postal Service*, 444 F.Supp. 100 (S.D.N.Y.1978).

## FINDINGS OF FACT

A hearing was held by the Court. Shidaker was not called as a witness. Based on the final pretrial order, which is incorporated by reference, and the testimony before the Court, the Court finds the following facts, as of the relevant times, many of which are adopted from the parties' statement of uncontested facts:

(1) Shidaker, began her Postal Service career on September 21, 1962, as Acting Postmaster of Kenilworth, Illinois. She was converted to Postmaster, Kenilworth, Illinois on May 8, 1964. This position was a PES–18.

(2) When Shidaker was appointed Acting Postmaster in Kenilworth, Illinois, it was her first employment in any capacity with the Postal Service or its predecessor Post Office Department, United States of America.

(3) Prior to her appointment at Kenilworth, Shidaker's employment experience was as follows:

1956–1958—Executive Secretary, "Business Week" (McGraw-Hill), Chicago, Illinois, earning $350.00 per month;

1958–1961—Office work, Stivers Officer Service, Chicago, Illinois, earning $4.00 per hour;

1961–1962—Office Manager, Jack Bullock & Associates, Chicago, Illinois, earning $100.00 per week.

(4) The Kenilworth Post Office is an associate post office of the North Suburban Metropolitan Service Center ("MSC"). The associate post offices employ approximately 5,000 employees, including postmasters and supervisors. In 1977 there were 108 associate post offices within the North Suburban MSC. Since 1977, one associate post office has been eliminated, leaving 107.

(5) Kenilworth is the smallest of the associate post offices according to the number of city delivery routes and rural delivery routes. It is a "Class C" post office, which embraces the associate post offices with the smallest delivery operations. In "Class C," Kenilworth ranks with the bottom six post offices by size of delivery operations:

| | |
|---|---|
| Kenilworth | - 3 City delivery routes |
| Fox River Grove | - 3 City delivery routes |
| Genoa | - 3 City delivery routes |
| | 3 City delivery routes and 3 |
| Marengo | - rural routes |
| Winfield | - 3 City delivery routes |
| Winthrop Harbor | - 3 City delivery routes |

(6) The Kenilworth post office is located in northern Cook County, Illinois. It serves a village with a population of 3,000. The area is not growing and contains only small commercial establishments and no industrial firms. There are three letter carrier routes. At the relevant time, the authorized complement of employees was 11, including a PES–18 postmaster, one supervisor and four part-time employees. Revenue for fiscal year 1977 was $112,297. In 1978, the position of supervisor was eliminated and the post office was downgraded to PES–15.

(7) On August 18, 1977, Shidaker applied for the vacant PES–22 level postmaster positions at Glenview, Palatine, and Franklin Park, Illinois.

(8) Franklin Park is a medium size first class post office, located in the western section of Cook County serving a population of 35,000. The town contains small industrial and commercial firms, several large manufacturing businesses as well as a switch-yard. There are 29 city routes and four auxiliary routes. The authorized complement of employees is 89, which includes a PES–22 postmaster, seven supervisors and 16 part-time employees. Revenue for fiscal year 1977 was $5,453,725 and operating expenses were $1,674,781.

(9) Palatine is a medium size first class post office located in central Cook County in an area of rapid residential and commercial growth. The office serves a population of 70,000. There are 42 city routes, one rural route and three auxiliary routes. The authorized complement of employees is 109, which includes a PES–22 postmaster and six supervisors. Revenue for fiscal year 1977 was $2,588,283 and operating expenses were $2,094,581.

(10) Glenview is a medium size first class post office located in the northern part of Cook County in a area of growing residential and commercial activity. The office serves a population of 52,000. There are 45 city routes and six auxiliary routes. The authorized complement of employees is 114, which includes a PES–22 postmaster and seven supervisors. Revenue for fiscal year 1977 was $3,648,185 and operating expenses were $2,121,720.

(11) Frank J. Santoro ("Santoro") has been Manager of the North Suburban MSC since August 14, 1976. Santoro and his staff supervise the operation of all of the associate post offices within the jurisdiction of the North Suburban MSC. Santoro and his staff are ultimately responsible for the efficient operation of the associate post offices, providing advice and supervision in such areas as mail processing, customer services, finance and employee and labor relations. Santoro also is responsible for the efficient operation of the North Suburban main mail facility which employs approximately 3,000 employees, including Santoro and his staff and the employees who sort the mail for the associate post offices. Santoro is the immediate supervisor of each associate postmaster.

(12) The North Suburban MSC is subordinate to the Northern Illinois District Office, Oakbrook, Illinois. That Office supervises several MSC's in Northern Illinois. Santoro's immediate supervisor is the Manager, Northern Illinois District. The current District Manager is Richard Koenigs. His predecessor was William Booras ("Booras").

(13) The Northern Illinois District is subordinate to the Regional Postmaster General (RPMG) for the Central Region. The Central Region encompasses 13 states, including Illinois. The RPMG and his staff are located in the Main Post Office, 433 W. Van Buren Street, Chicago, Illinois. The Postmaster General, Washington, D.C., is the immediate supervisor of the (RPMG), Central Region as well as the RPMGs for the Northeastern, Eastern, Southern and Western Regions.

(14) During the relevant time period, the Postal Service had an affirmative action program for women, sometimes referred to as the "women's program."

(15) There were a total of 92 applicants for the postmaster positions in Glenview, Palatine, and Franklin Park, and Shidaker was the only female among them.

(16) The Postal Service has a policy of promoting from within. Ordinarily promotions are made one step at a time, e.g., from a PES–20 to 21.

(17) On November 3, 1977, a Postmaster Screening Board, composed of W. Robert Sleep, Postmaster, Northbrook; Ralph Wright, Postmaster, Oak Park and former postal inspector with jurisdiction over the Kenilworth post office; Richard Skala, Director Customer Services North Suburban MSC; and Walter L. Besteda, Director, Employee and Labor Relations, North Suburban MSC, met to review applications and screen candidates for the positions of Postmaster, Glenview, Palatine, and Franklin Park, Illinois. Besteda is black. No woman was on the Screening Board.

(18) The Screening Board did not interview the applicants. Each Screening Board member scored each applicant individually, for each vacancy, and the results were cumulated. In evaluating the applicants, including Shidaker, the Board had available:

(a) the applicant's "Personal History Summary" which showed the applicant's educational background, including Postal Service courses taken, Postal Service employment experience, non-Postal Service employment experience, participation in civil, fraternal and professional organizations, and awards;

(b) the applicant's "Estimate of Potential" (PS 2577) prepared and submitted by the applicant's immediate supervisor. Form 2577 rates factors such as "motivation," "personal growth," and "capacity to learn."

(c) the applicant's "Analysis of Experience, Background and Potential" which showed the applicant's experience and per-

formance in such matters as labor relations, Equal Employment Opportunity, decision making (problem solving), budget operations, employee development, supervision, supervision of branch operations, planning and scheduling of work, safety and health, customer and community relations and general observations;

(d) the applicant's personnel file; and

(e) any relevant personal knowledge that the Board members had concerning the applicant's work performance. The Screening Board also had available data concerning the community, employee complement, number of carrier routes and dollar revenue of each of the vacant post offices.

(19) During their meeting on November 3, 1977, the Screening Board first evaluated the applicants to determine those who did not meet the minimal qualifications for the three positions. These applicants were given no consideration for the positions. Eleven male applicants, fifteen male applicants and sixteen male applicants, were not considered minimally qualified for the postmaster positions in Franklin Park, Palatine, and Glenview, respectively.

(20) The Screening Board next evaluated those applicants, including Shidaker, who were determined to be at least minimally qualified for the positions. In evaluating these applicants, each Screening Board member used the following scoring system:

8–7: Outstanding Candidate
6–5: Very Good Candidate
4–3: Acceptable Candidate

When the scores were tallied, the highest score an applicant could receive was thirty-two. The Screening Board decided not to recommend further consideration of those candidates who received less than twenty points.

(21) At each of the three post offices there were one or more applicants who were automatically entitled to be interviewed and considered for the vacant position. The Screening Board did not evaluate these applicants.

(22) In connection with the review of Shidaker for promotion, both Besteda and Wright testified to advising the Screening Board of their first-hand knowledge of the conditions of the post office run by her. Wright, as a postal inspector, had investigated an instance of poor security in connection with the issuance of money orders and he described Shidaker's management as sloppy. Wright stated that he told the Screening Board that Christmas mail deliveries were two or three days late. Besteda also told the Screening Board that the Kenilworth post office was not well managed.

(23) There were 32 applications for the Postmaster of Glenview, and Shidaker was the only female. She received a numerical rating of 13, which placed her in the thirteenth position of 16 qualified applicants. The remaining 16 were deemed unqualified and were not numerically rated. The Screening Board recommended seven male applicants as "qualified and able to assume the duties of the position" at Glenview. Their scores ranged from 20 to 24.

(24) There were 32 applicants for Postmaster of Palatine, and Shidaker was the only female. She received a numerical rating of 11, which placed her in the sixteenth position of the 17 qualified applicants. The remaining 15 were deemed unqualified and were not numerically rated. The Screening Board recommended seven male applicants as "qualified and able to assume the duties of the position" at Palatine. Their scores ranged from 20 to 24.

(25) There were 28 applicants for Postmaster of Franklin Park, and Shidaker was the only female. She received a numerical rating of 11 which placed her in the fifteenth position of the 17 qualified applicants. The remaining 11 were deemed unqualified and were not numerically rated. The Screening Board recommended seven male applicants as "qualified and able to assume the duties of the position" at Franklin Park. Their scores ranged from 20 to 24.

(26) Plaintiff was not selected for any of the above vacant postmaster positions.

(27) By letters dated December 21, 1977, and January 4, January 5 and March 21,

1978, Santoro sent his immediate supervisor Booras the names of applicants eligible for consideration for the vacancies. Some of the names submitted to Booras were from the lists of applicants recommended by the Screening Board as "qualified and able to assume the duties of the position." The other names sent forward by Santoro were applicants employed at Franklin Park, Palatine and Glenview who had a right to automatic consideration for the vacant positions in their respective offices.

(28) The applicants designated in Santoro's letters to Booras were interviewed by the Regional Management Selection Board ("RMSB") of which Gilbert Brown, Regional Postmaster Selection Officer, was the executive secretary. The RMSB then recommended to the Postmaster General one applicant for consideration for each vacancy on the basis of the applicant's performance during the interview and his qualifications reflected in the materials, *e.g.* personal history summaries, and estimates of potential.

(29) The Postmaster General selected the following applicants to fill the positions:

a. *Postmaster at Franklin Park:*
   Robert G. Boeckenhauer ("Boeckenhauer")
   Manager, Mail Processing (PES–21)
   Des Plaines, Illinois

b. *Postmaster at Palatine:*
   James A. Daily ("Daily")
   Postmaster (PES–20)
   Bloomingdale, Illinois

c. *Postmaster at Glenview:*
   William J. Soto ("Soto")
   Postmaster (PES–18)
   Algonquin, Illinois

Soto's name was not among those initially submitted by Booras for consideration for the Glenview vacancy. He had received only 19 points when he was evaluated by the Screening Board. However, some of those candidates who had earned 20 points and had been submitted for consideration withdrew. Thereafter, Santoro added Soto's name to the list of applicants to be considered for Glenview.

(30) Boeckenhauer's promotion was from a PES–21 position. He had 21 years of service and was serving in grade 21 since March of 1973. The Des Plaines Post Office is grade level PES–24. It serves a population of 105,000. There are 88 regular and three auxiliary routes. The authorized complement of employees is 232 including 14 supervisors.

(31) Daily's promotion was from PES–20. He had 12 years of service and was serving in grade 20 since August of 1975 as postmaster of the Bloomingdale, Illinois 60108 post office. That post office serves a population of 11,500. It is grade level PES–20. There are six regular and three auxiliary routes. The authorized complement of employees is 16 including one supervisor.

(32) Soto's promotion was from PES–18. He had 15 years of service and was serving in grade 18 since being appointed postmaster of Algonquin, Illinois in November of 1974. Algonquin, Illinois 60102 serves a population of 14,000. It is grade level PES–18. There are three regular and one auxiliary routes. The authorized complement of employees is 15 including one supervisor and five part-time employees. Revenues for fiscal year 1977 were $237,000 and operating expenses were $259,325. Soto's entry level position with the Postal Service was at level four, as a temporary carrier at Geneva, Illinois. He received six promotions before being appointed postmaster at Algonquin.

(33) The selected candidates were all given positive ratings by their immediate supervisors.

(34) During 1977 and 1978 the statistical breakdown by gender of the Postal Service's work force in the North Suburban MSC was as follows:

| PES Level | M | F | % F |
|---|---|---|---|
| 1–27 | 5,309 | 2,208 | 29.4 |
| 19–27 | 76 | 4 | 5.0 |

(35) According to data introduced by Shidaker in November 1974, there were 20.8% women in the Postal Service's workforce nationally, including postmasters. In the first quarter of 1980, the percentage was 23.51%. In January of 1980, women held

11.5% of the national Postal Service positions in PES levels 15 and above.

In 1978, women held 23 or 21.2% of the 108 postmaster positions in the North Suburban MSC. None of them was ranked higher than PES–20. The breakdown is:

PES–20—2

PES–18—4

PES–17—2

PES–15—5

PES–12—9

PES–03—1

(36) No evidence of applicant flow was presented.

(37) On April 28, 1978, Shidaker filed an Equal Employment Opportunity ("EEO") complaint alleging that she was denied promotion to the PES–22 level postmaster positions on the basis of sex.

(38) On February 27, 1980, a hearing on Shidaker's complaint was held before Equal Employment Opportunity Commission ("EEOC") Complaint Examiner Robert Johnson ("Johnson").

(39) In a decision dated September 2, 1982, Johnson found that Shidaker was denied promotion on the basis of sex. He also found that the procedure used by the Postal Service to make the promotions had a discriminatory impact on women. He did not, however, find discriminatory the fact that no woman was on the Screening Board.

(40) In a letter dated October 25, 1982, the Postal Service's Regional Director for Employee and Labor Relations Central Region, informed Shidaker that the Postal Service was rejecting Johnson's decision of September 2, 1982.

(41) While Shidaker's EEO complaint was pending, Santoro rated her "marginal" on her merit performance evaluations for fiscal years 1980 and 1981. Prior to 1980 she had never received anything less than a "satisfactory" rating. A marginal rating denies an employee a salary increase.

(42) No female postmasters except Shidaker received "unsatisfactory" or "marginal" merit evaluations in 1980, 1981, and 1982. Santoro gave three male postmasters "unsatisfactory" merit evaluations in 1978. In 1979, Santoro gave two male postmasters "marginal" merit ratings. In 1980, Santoro gave three male postmasters "marginal" ratings. In 1981, Santoro gave one male postmaster a marginal rating. In 1982, Shidaker was the only postmaster to receive a "marginal" rating. In 1983, two male postmasters were given "marginal" ratings.

(43) Santoro's written comments accompanying Shidaker's evaluation in 1980 indicate:

Ms. Shidaker rated herself "Good" but she received a "Marginal" rating because of poor performance in all major areas of her office. Blames her supervisor for performance of office. Negative performance in carrier operation of 8.2% even after discounting Accounting Periods 4 and 5 due to severe weather. Clerk productivity down 1.7% vs SPLY [Same Period Last Year]. Needs to become more directly involved in office operations and to improve her attitude and cooperation with MSC staff. [Bracketed words added].

(44) On April 28, 1980, Shidaker was issued a "Proposed Notice of Adverse Action." The Notice informed her that Santoro proposed to remove (discharge) her from employment for incidents of "misappropriation and personal use of postal funds," and for "misrepresentation of work hours." The dates alleged were October 8, 1978, August 17, 1979, November 19, 1979 and January 17, 1980. The incidents involved the alleged unauthorized issuance of postal money orders in the amounts of $20.00 and $35.00 for personal annual membership fees in an organization called "Women In Management;" the unauthorized purchase with Postal Service funds of a Village of Kenilworth motor vehicle sticker for Shidaker's personal automobile; and taking 32 hours of leave but knowingly entering the time as worked on her time card rather than charging the absence to annual leave.

(45) On September 3, 1980, Shidaker, who was represented by counsel, entered

into an EEO settlement of the notice of removal. The settlement agreement provided, in pertinent part, that she would be reduced "from a step six to step three in the EAS [1] 18 pay scale." This reduction in pay amounted to approximately Three Thousand Dollars ($3,000.00).

(46) In 1981, Santoro wrote on Shidaker's evaluation form: "Employee rated 'marginal' because of misappropriation of postal funds."

(47) On February 8, 1982, Santoro issued Shidaker a "Proposed Notice of Reduction in Grade." It was proposed that due to her alleged official misconduct she be reduced from Postmaster, Kenilworth, Illinois, PES–18 at a salary of $26,300, to a full-time distribution clerk, PES–5, Step 12, at a salary of $22,325.00.

(48) Shidaker ultimately was reduced in grade to a level PES–5, full-time regular distribution clerk.

(49) On February 18, 1982, Shidaker filed a written EEO complaint, claiming that the February 8, 1982 notice of grade reduction was issued in reprisal for filing on April 28, 1978 her EEO administrative complaint concerning the failure to be promoted. She scheduled an appointment to discuss the prior EEO complaint with a Postal Service EEO Investigator.

(50) Shidaker previously had filed timely EEO complaints alleging that the marginal ratings for 1980 and 1981 were issued in retaliation for her filing of the EEO complaint in 1978. By a decision dated August 6, 1982, the EEOC issued a final administrative determination that Shidaker's marginal rating for fiscal years 1980 and 1981 did not violate Title VII. Shidaker renewed the claims of retaliation in her civil complaint but abandoned them before trial.

(51) Shidaker also filed an administrative appeal from her reduction to a PES–5 distribution clerk. By letter dated March 1, 1983, the Postal Service informed her that its final decision was that the charges

against her were supported by the evidence and warranted the reduction.

(52) The meaning and purpose of the 16 item Model Delivery Office ("MDO) Checklist," which is part of the Postal Service's Exhibit 22, is as follows:

> *Item 1.* "Minimum—80% Mail Volume
> a. Mail ledged for carrier."

The purpose of Item 1 is to have at least 80% of the morning mail volume at each post office sorted by the clerks and at each letter carrier's sorting case when the carrier starts work. Before the carrier leaves the post office to deliver his or her route, he or she must "case" the mail, that is, sort it in sequence of delivery, by street and address. The carrier "cases" the mail by sorting it into designated separations ("pigeon holes") in the carrier's case. Each carrier case has a "mail ledge" at the front of the case where the mail is placed for "casing." The mail is placed on the ledge, stamp side down and to the carrier's right hand side to ensure efficient casing.

> *Item 3.* "DUVRS
> a. Data used for workhour decisions."

"DUVRS" means "Delivery Unit Volume Recording System." It requires the measurement with a foot rule of the daily mail volume ultimately delivered by the letter carrier. It is estimated that a linear foot of letter size mail contains 250 pieces. "Flats", such as magazines and other magazine size mail, contain 115 pieces per linear foot. These daily measurements are made so that supervisory and managerial employees can decide whether a carrier needs overtime, auxiliary assistance by another carrier or curtailment of mail on a given day or whether individual carriers have insufficient volume ("undertime") to fill an eight hour day.

> *Item 4.* "Workload Leveling."

The objective of workload leveling is to ensure that each carrier has sufficient mail

---

**1.** There is some confusion over the designation of pay scale categories, *i.e.,* "PES," "PMS" or "EAS." Each designation likely is correct, depending on the year in question. For example, in 1980 the "EAS" designation apparently replaced the "PES" rating. For ease the Court adopted the "PES" designation, except where the rating appears within a quotation.

to fill an eight hour day. "Leveling" is achieved by curtailing the delivery of mail on a given day and also by dividing mail between carriers so that each has enough mail to fill an eight hour day.

*Item 5.* "Carrier Control Forms."

Item 5 requires the daily review of workhour control forms and mail volume curtailment forms. The purpose of this review is *inter alia* to reduce the need to curtail the delivery of mail; to eliminate problems of carriers leaving the office late to deliver their routes; to eliminate problems of late delivery of mail; to eliminate problems of excess overtime; and to correct problems of carrier work methods.

*Item 6.* "Pivoting."

Pivoting involves assigning carriers having "undertime" to assist carriers who have more mail than they can deliver in eight hours. Effective pivoting requires daily knowledge of the mail volume of each carrier.

*Item 7.* "Reporting Times.
 a. Supervisors
 b. Carriers
 (1) 80% Mail Volume
 (2) FLSA"

This item requires that the starting times of supervisors and carriers be checked and coordinated so that the supervisor, or other responsible person, starts work ahead of the carriers to ensure *inter alia* that 80% of the mail volume is sorted by the clerks and at the carrier's case when the carrier starts work. It also is required that the carrier's starting time be scheduled so that the carrier does not start before the 80% requirement is met.

The Fair Labor Standards Act ("FLSA") aspect of the program requires responsible management or supervisory personnel to monitor the times that employees punch in and out, or otherwise start and end work, so that they do so at appropriate times in order to avoid unearned overtime under FLSA.

*Item 8.* "Park Points."
 a. Five or less unless otherwise justified.

Letter carriers who drive their routes, drive to various points, park and lock their vehicles and deliver a portion of the mail. The purpose of restricting parking points to five or fewer points is to save gasoline, unnecessary mileage and time otherwise lost by unnecessary parking and locking and mounting and dismounting the vehicle.

*Item 9.* "Relays.
 a. Weighed In Office."

A relay is a segment of a carrier's route which weighs approximately 30 pounds, the weight a carrier carries and delivers at a given time. The relays are weighed at the post office so that the 30 pound requirement is met for each relay. The purpose is to assure the minimum possible relays thereby avoiding unnecessary relays and wasted time.

*Item 10.* "Office Supervision."

The purpose of office supervision is to ensure that employees observe proper starting and stopping times, use efficient work methods and observe the other rules of the workplace.

*Item 11.* "Street Supervision."

The purpose of street supervision is to ensure that carriers are using efficient work methods and observing pertinent work rules. Street supervision includes checking whether the carrier is taking appropriate short cuts, following efficient delivery patterns, unnecessarily deviating from the route and taking lunch and other breaks at designated times and locations.

*Item 12.* "Mobile Accountable Cart."

Item 12 is a system by which accountable mail, *e.g.* registered, certified, C.O.D. and postage due mail, is brought to the carrier at his or her case in order to save time.

*Item 13.* "Parking and Loading."

The purposes of "Parking and Loading" include checking for the most efficient parking places for Postal Service vehicles in order to avoid interference with official vehicle operations and designated customer parking; and checking whether employees efficiently load vehicles for sequential route delivery; make a minimum number

of trips from office to the vehicle; and how they transport mail to the vehicle.

*Item 14.* "Review PS Forms 4570."

A PS Form 4570 is a Vehicle Trip Report, documents daily starting and ending times and mileage. Its purpose is to ensure proper utilization of the vehicle. For example, review of the forms ensures that the reports are made; forms are accurately filled in; unauthorized mileage is not used; and mileage rates are accurate.

*Item 15.* "Carrier Route Books."

Route books are checked to verify that they contain required information. For example, they must contain the route map; any special instructions for the route; the form which reflects designated break and lunch times and designated lunch locations; and the M–41 handbook which is the carrier work method book.

*Item 16.* "Carrier Case Labels."

These are strip labels of various colors ("color coded") which bear the street name and delivery addresses in delivery sequence. These labels are affixed to the appropriate pigeon holes in the letter carrier's sorting case. It is required that the labels be typewritten and color coded. Color coding results in separations for letters and flats with the same destination bearing the same color.

(53) Defendant's Exhibit 64 is a "Daily Condition Report" form. It is used during specified accounting periods, including the Christmas season period of heaviest mail volume. Column 1 lists four post offices within the North Suburban MSC. Lake Bluff, Kenilworth and Morton Grove are required to call in to the Park Ridge Post Office the information in columns two through eight daily by a specified time. Column two reports the number of city delivery routes. Column three reports the total number of trays, 500 pieces of first class ("pref") mail per tray that the clerks have not sorted by their "cut off time," the time they were required to stop sorting mail. "Pref mail" includes personal letters, registered letters, and certified return receipt mail. "Non Pref" mail includes magazines and advertisements. Column

four reports the total number of trays of "pref" mail that have not been sent to the carriers' cases at the clerks' cut off time. Column five reports the number of carrier routes which have curtailed, *i.e.*, not to be delivered, "pref" mail. Column six reports the number of routes with three or more trays of curtailed "pref" mail. Column seven reports any "nonpref" mail more than one day behind in delivery. Column eight reports any parcel post mail more than one day behind in delivery.

One of the main reasons for acquiring this daily information during the Christmas season is to ensure the timely delivery of the mail by post office to post office assistants and other means. Management personnel also need this daily information so that they can readily answer inquiries from the public concerning the status of mail delivery during the peak season.

### CONCLUSIONS OF LAW

Shidaker attempts two theories for proving a Title VII violation relative to her failure to win promotion: (1) the Postal Service's procedure for selecting candidates for promotion to postmaster has a "disparate impact" on women; and (2) the Postal Service intentionally discriminated against her by promoting a male instead of her, although she was qualified.

### DISCRIMINATORY IMPACT

A plaintiff makes a *prima facie* case of discriminatory impact merely by showing that the employer's facially neutral criteria for hiring or promotion have an adverse impact on a protected class to which he or she belongs. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Unlike a case of "disparate treatment," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), proof of wrongful motive is not required. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Where an individual brings a discrimina-to-

ry impact claim, a *prima facie* showing is not overcome by the employer's subsequent attempt to minimize the discriminatory impact of the procedure by favoring some members of the protected group. Title VII provides an *equal* opportunity for each applicant, and " '[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.' " *Connecticut v. Teal,* 457 U.S. 440, 454–55, 102 S.Ct. 2525, 2534–2535, 73 L.Ed.2d 130 (1982), quoting *Furnco Construction Co. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

■ *Prima facie* adverse impact is demonstrated by various statistical means, depending on the nature of the challenged practice and the employer. Regardless of the method chosen, the plaintiff must present supporting statistical data with some degree of precision. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Soria v. Ozinga Brothers, Inc.,* 704 F.2d 990 (7th Cir.1983). In limited circumstances, a court may project disparate impact from non-statistical data. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Carpenter v. Board of Regents,* 728 F.2d 911, 914 (7th Cir.1984).

■ If adverse impact can be inferred from the plaintiff's data, the employer may present evidence indicating that the challenged practice or rule is a "business necessity." *Griggs v. Duke Power Co., supra.* The practice or rule must bear a manifest relation to the job in question. *Id.,* 401 U.S. at 432, 91 S.Ct. at 854. *See also Solo Cup Co. v. Federal Insurance Co.,* 619 F.2d 1178, 1186 (7th Cir.), *cert. denied* 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980).

■ If the employer shows that the challenged procedure is necessary to its business, the plaintiff may show that the rule actually is a pretext for discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). It is at this juncture only that the employer's motive is tested. *New York City Transit*

*Authority v. Beazer, supra.* A plaintiff may demonstrate pretext by showing that other, non-discriminatory, selection criteria would serve the employer's purpose as well. *Carpenter v. Board of Regents, supra.*

The burden of proving discriminatory impact remains with Shidaker throughout the inquiry. Only the burden of going forward is imposed upon the Postal Service if a *prima facie* showing of discriminatory impact is made. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

As a threshold matter, it is arguable whether disparate impact analysis is even proper here where the system attacked includes both objective and subjective parts. The Eighth Circuit addressed the question and holds that "[a] subjective decision-making system cannot *alone* form the foundation for a discriminatory impact case." (emphasis added). *Harris v. Ford Motor Co.,* 651 F.2d 609, 611 (8th Cir.1981). *See also Talley v. United States Postal Service,* 720 F.2d 505, 507 (8th Cir.1983), *cert. denied* 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984). The Seventh Circuit recently noted the issue, but found it unnecessary to resolve. *Soria v. Ozinga Brothers, Inc., supra.*

■ The use of subjective criteria is not unlawful *per se.* *See e.g., Rogers v. International Paper Co.,* 510 F.2d 1340, 1345 (8th Cir.), *vacated and remanded on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). The question is do the selection criteria, objective or subjective, impermissibly burden a person in a protected group. Thus discriminatory impact analysis may be applied here, though the procedure which is challenged consists of subjective parts.

The validity of subjective devices increases in direct proportion to the level of employment sought. In cases where the skills sought are minimal or can be objectively quantified, or the position is entry level, courts reject as illegitimate purely subjective valuations of potential or fitness. *Nanty v. Barrows Co.,* 660 F.2d 1327 (9th

Cir.1981); *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir.1972).

■ In contrast, while objective factors may play a threshold role in professional or entry level management positions, decisions as to promotions at these levels likely turn on an evaluation of more intangible subjective qualities, such as leadership skill and ability to take decisive action when necessary. However, even subjective tests for upper level employees and professionals will not withstand scrutiny unless the underlying goals are clear and job-related. *See, e.g., Davis v. Board of School Commissioners*, 600 F.2d 470, 474–75 (5th Cir. 1979) (principal); *Peters v. Lieuallen*, 568 F.Supp. 261, 266 (D.Or.1983) (compliance officers, state department of higher education). *But see Leisner v. New York Telephone Co.*, 358 F.Supp. 359 (S.D.N.Y.1973) (interviews for women in management rejected). *See also Yuhas v. Libbey-Owens-Ford Co.*, 562 F.2d 496 (7th Cir.1977) (husband and wife); discriminatory intent cases: *Harris v. Group Health Association, Inc.*, 662 F.2d 869 (D.C.Cir.1981) (doctor); *Frausto v. Legal Aid Society of San Diego, Inc.*, 563 F.2d 1324 (9th Cir.1977) (attorney); *Powell v. Syracuse University*, 580 F.2d 1150 (2d Cir.), *cert. denied* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (professor); *Chalk v. Secretary of Labor*, 565 F.2d 764 (D.C.Cir.1977), *cert. denied* 435 U.S. 945, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978) (writer/editor).

■ Although it is appropriate to use disparate impact analysis, Shidaker fails to make out a *prima facie* case of disparate impact. The statistics presented to the Court are as follows: In November, 1974, women held 20.8% of the positions in the Postal Service workforce. The percentage had moved to 23.5% by November, 1980. Nationally, women held 11.5% of the positions at PES–15 and above in January, 1980.

In 1978, the year of Shidaker's failed promotion, women occupied 23 of the 108 postmaster positions in the North Suburban MSC, or 21.2% of the total postmaster positions. However, none of the women postmasters were rated higher than PES–20 and 15 of them were at level PES–15 or lower. Additionally in 1977–1978 a total of 2,008 women were employed in the North Suburban MSC, 29.4% of the entire Postal Service workforce in the area. Despite that overall percentage, only four women or 5% were rated in positions of PES–19 or higher. Grossly, the disparities could be significant.

However, aside from informing the Court that she was the only female applicant for the three PES–22 postmaster vacancies in 1977, Shidaker presented no other evidence of applicant flow. The Court was not informed of how many women, if any, had applied for X number of vacant postmaster positions, of any level, in the past. Nor does the Court know how many women even were eligible to apply for the 1977 or past vacancies. No breakdown of the number of women in each PES position by year was presented. Without such basic data, the impact of the Postal Service's promotion procedure cannot be fairly tested.

The use of statistics in investigation of management discrimination is complicated by the problem of defining the relevant labor pool. Lower level jobs require skills present or readily acquired by persons in those categories. Such an assumption does not apply to management jobs which demand skills and training possessed by relatively few individuals. Accordingly, the absence of applicant flow data is a serious deficiency in Shidaker's proof. Although expert testimony is not required in every case, no presentation was made to analyze or probe the limited data which were presented.

The paucity of data also prevented the Court from testing for adverse impact by reference to the "Four-Fifths Adverse Impact Rule" utilized by the EEOC. 29 C.F.R. ¶ 1607.4. Under this approach, a selection rate is determined by examining the employer's actual experience in hiring or promoting, and comparing the percentage of minority applicants with nonminority applicants who are hired. If "[a] selection rate for any race, sex or ethnic group ... is less than four-fifths ($\frac{4}{5}$) of the rate

for the group with the highest rate," the selection process normally has an adverse impact. *Id.*

Having failed to prove a *prima facie* case of discriminatory impact, it is unnecessary for the Postal Service to prove whether its promotion procedure was a business necessity.

## DISPARATE TREATMENT

The Court concludes that Shidaker has made a *prima facie* showing of disparate treatment in accordance with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): [2]

(1) she belongs to a group protected by Title VII;

(2) she was at least as qualified for promotion as one of the candidates selected;

(3) she was considered but denied promotion; and

(4) the jobs that she sought were filled by men.

Of the three candidates promoted to the positions sought by Shidaker, two of them were more qualified when judged only by objective criteria. Prior to promotion, Boeckenhauer was a PES-21 postmaster in Des Plaines. The Des Plaines Post Office was roughly comparable to any of the three post offices with vacancies. It served a population of 105,000, with 88 regular mail routes and utilized 232 employees. Boeckenhauer had been with the post office for 21 years, four of which were at grade PES-21.

Daily had 12 years of service, with two years in grade PES-20. He managed the Bloomingdale Post Office, which served a population of 11,500, with six regular routes and 16 employees. Although the difference between Shidaker's qualifications and Daily's is not as dramatic as the difference between those of Shidaker and Boeckenhauer, a marked difference nonetheless exists. While Shidaker had 15 years experience, 13 of which were at PES-

18, all her service was at the Kenilworth Post Office, one of the six smallest in the North Suburban MSC. Kenilworth's population is almost four times smaller than Bloomingdale's, and it has one half as many delivery routes. Furthermore, Shidaker was responsible for only six full-time employees, the other four positions authorized were part-time positions.

■ The Postal Service has demonstrated that Boeckenhauer and Daily were selected for their superior qualifications. In *Holder v. Old Ben Coal Co.*, 618 F.2d 1198, 1201–02 (7th Cir.1980), the Seventh Circuit stated

[a] desire to hire the more experienced or better qualified applicant is a non-discriminatory, legitimate and common reason on which to base a hiring decision. Thus ... plaintiff must foreclose this possible explanation for a hiring decision before a *prima facie* case is established.

By inference, the Title VII plaintiff in this Circuit must allege that he or she is as qualified or more qualified than those persons who received the position sought by the plaintiff. *See also Mason v. Continental Illinois National Bank*, 704 F.2d at 364. ("No rational enterprise that has several qualified candidates for a position selects among them by lot, it picks the best qualified").

Thus if Shidaker is to prevail at all, it must be by demonstrating first that she is as qualified as Soto and second that the Postal Service promoted Soto instead of her for discriminatory reasons. Shidaker and Soto each were rated as PES-18 postmasters and had been employed by the Postal Service for 15 years. Furthermore, both the Algonquin and Kenilworth Post Offices had only three regular delivery routes. On one level, it appears that Shidaker was more qualified for promotion than Soto. Shidaker served in a PES-18 position for 13 years, while Soto was in that grade for fewer than three years. That "deficiency" in Soto, however, is balanced by the fact

---

**2.** There is some doubt in this Circuit whether the *McDonnell Douglas* standards for *prima facie* disparate treatment apply in promotion cases, where the criteria are subjective and the evaluation is comparative. *Mason v. Continental Illinois National Bank*, 704 F.2d 361 (7th Cir.1983).

that Soto entered the Postal Service as a level four employee and received six promotions before his appointment as postmaster in Algonquin. Shidaker's position as a PES–18 was an entry level position. Another leveling factor is that the Algonquin Post Office serves a population area more than three times the size of the Kenilworth Post Office, thereby exposing its postmaster to a greater degree of financial transactions and experience. Finally, at Algonquin, Soto was in charge of 15 employees including one supervisor and five part-timers. Shidaker's authority extended over ten employees including five part-timers.

 Although the case is close, the Court finds that on balance Shidaker and Soto were roughly of equal qualifications.[3] Shidaker has made out a *prima facie* case of disparate treatment. The burden of going forward now shifts to the Postal Service to articulate a legitimate, nondiscriminatory reason for denying the promotions to Shidaker. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green, supra.*

The Postal Service states that the reason for selecting Soto over Shidaker was that Shidaker was not recommended by the Screening Board. Her composite score for each vacancy was below 20, which was the cutoff score between recommendation and not. Soto's composite score for the Glenview vacancy was 19, and he also was not recommended initially. His name was put forward only after those candidates with higher scores either dropped out or were otherwise eliminated. Soto and one other candidate had the next highest scores of 19. It is irrelevant whether both of the men who earned scores of 19 were then recommended. What is important is that *a* next most qualified candidate was recommended and ultimately selected. The rea-

son that Soto was elevated into the running, *i.e.*, his higher composite score, is a legitimate, nondiscriminatory business reason—if the process used to arrive at that score is valid under the circumstances.

The Postal Service has demonstrated that the persons selected to fill the vacancies were required to have high levels of management skills. Each post office vacancy to be filled, including the Glenview office to which Soto was promoted, was designated "medium size, first class," served populations ranging in size from 35,000 to 70,000, included commercial and industrial firms, had from 29 to 42 regular delivery routes, and was growing. The postmasters chosen would supervise between 89 to 114 employees and be responsible for annual revenue of up to $5.5 million.

To probe the managerial ability of the applicants, a Screening Board, which included one minority member, was appointed and given previously compiled records of each applicant. Those records included both Postal Service and non-Postal Service histories. Of particular relevance was material on each applicant's experience and performance in employee relations, budget operations and planning and scheduling of work. To the historical data was added an "Estimate of Potential," prepared by the applicant's immediate supervisor. The Estimate rated the applicant on factors such as motivation, personal growth and learning capacity.

The initial scores assigned to each applicant were derived by each screener without consultation with the others, thereby minimizing the possible force of anecdotal influence in the first scoring. Each applicant was separately rated for each vacancy sought. Although the screeners later added their specific, firsthand observations about Shidaker's work style and managerial ability, (and presumably about the other applicants), those observations were perti-

---

**3.** The Court could have found that Shidaker was not even minimally qualified and, therefore, that no *prima facie* case was proved. The Screening Board established that no candidate with less than 20 points would be recommended. That finding was rejected, however, as the Court, considered instead the grosser qualifications of longevity and level of service to constitute minimal qualifications. Soto was not awarded 20 points as a composite score by the Screening Board either.

nent to the skills required for the positions sought.

While most of the material relied upon by the screeners was subjectively derived, the Screening Board made an effort to objectify its decision by applying a point system to the findings, considering each vacancy separately and then by comparing each candidate to the others. Each candidate who was not automatically entitled to be recommended for interview, was required to be evaluated by this same subjective/objective process. The Court finds that the procedure used by the Postal Service to initially select candidates for promotion consideration was permissible and without overt indicia of discrimination.

■ It remains only to decide whether the Postal Service erred by selecting Soto instead of Shidaker. It did not. There is no obligation under Title VII requiring an employer to integrate its workforce or make gender-preferential promotions where all candidates are equal or minimally qualified. *Texas Department of Community Affairs v. Burdine, supra.* "[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.* at 259, 101 S.Ct. at 1097. Similarly, outside the factory setting the first qualified applicant need not be selected where a choice is made " 'on the basis of qualifications, recommendations and subjective impressions.' " *Mason v. Continental Illinois National Bank,* 704 F.2d at 365, quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017, n. 18 (1st Cir.1979).

■ Where, as here, the promotion selection among minimally and arguably equally qualified applicants was made for a legitimate business reason, and no evidence of purposeful discrimination is offered, a plaintiff cannot show that the employer's proffered reasons are pretext. Shidaker cannot rebut by showing that "but for" gender discrimination she would have been selected. *See McCluney v. Joseph Schlitz Brewing Co.,* 728 F.2d 924, 928 (7th Cir. 1984); *Sherkow v. State of Wisconsin, Department of Public Instruction,* 630 F.2d 498, 502 (7th Cir.1980). Shidaker has not

proved, by a preponderance of the evidence, that the Postal Service failed to promote her because she was a woman.

## RETALIATORY REDUCTION IN GRADE

■ The matter of administrative review of Shidaker's reduction in grade was presented to the Court without supporting briefs discussing the evidence or, with one exception, oral argument pointing out in what respect Shidaker claims the hearing officer erred. That exception relates to Shidaker's claim that she did not receive a copy of a letter sent by Santoro to a higher authority after Shidaker's response to the damages for grade reduction. The Court has reviewed the administrative record and the notice of reduction in grade and finds that the decision to reduce is supported by substantial evidence.

The charges in the notice to reduce which were found to be substantial after administrative review were (1) failure to follow management's instructions; (2) failure to timely report status of mail and failure to follow managerial instructions; (3) failure to train an employee to assume responsibility in Shidaker's absence; (4) falsely accusing an employee of serious misconduct; and (5) failure to take disciplinary actions against an employee despite management's instructions to do so. Shidaker also had been notified that her reduction was due to a failure to file reports of status mail during the Christmas 1981 period and misrepresentation of work hours. However, those charges were not sustained.

A review of the relevant evidence in support of the finding for grade reduction is: Shidaker persistently ignored or disobeyed repeated instructions to bring her office into compliance with the Fair Labor Standards Act by correcting numerous timekeeping and pay computation errors involving straight time, overtime and night differential pay for her employees. Ultimately, personnel at the North Suburban MSC had to prepare the necessary corrected forms and send them to Shidaker for her signature. Shidaker's failure to make these corrections cost the Postal Service $356.00.

Despite notice of the MDO program and its efficiency goals, and training and instructional visits by members of the MSC staff, Shidaker failed to bring her post office into compliance with several items of the program: Item 1, requiring the availability of 90% of the mail volume for the letter carriers when they report for work; Item 3, "DUVRS," which is data used for work hour decisions; Item 4, workload leveling; Item 5, carrier control forms; Item 7, reporting work hours of supervisors and carriers; Item 8, park points—5 or less unless otherwise justified; Item 9, relays; Item 10, office supervision; Item 11, street supervision; Item 12, mobile accountable cart; Item 14, Review PS (Postal Service) forms 4570; Item 15, carrier route books.

Shidaker also failed, despite repeated instructions, to change her starting time to 8:00 a.m. so that she could "assign auxiliary assistance or overtime" for the letter carriers and make any decisions necessary to expedite the sorting and casing of the mail; to appoint and train an acting supervisor (204B supervisor) who could serve in her absence; and to submit a 16 point MDO check list reflecting the dates by which she proposed to implement the 16 MDO items or the dates on which she had implemented the items.

All postmasters in the North Suburban MSC were instructed to complete the "Daily Condition Report," which is a seven (7) item report concerning the status of mail in their post offices, during the period December 10–24, 1981. They also were instructed to report the information daily by telephone to a designated post office. Shidaker failed to make her report in a timely manner to the Park Ridge Post Office on Saturday, December 12, Monday, December 14, and Thursday, December 17, 1981. When requested to explain this failure, Shidaker's response to one MSC manager was, "Cool it man." When Santoro requested an explanation, Shidaker accused Santoro of being "completely out of line" and of having "very poor judgment."

Shidaker failed to comply with Santoro's July 27, 1981 order that she train an employee to serve as an acting supervisor (204B supervisor) during her absences. She also failed to comply with Santoro's subsequent order of August 5, 1981. On December 16, 1981, almost five (5) months later, Shidaker requested a level 13 supervisor to cover the Kenilworth post office during her forthcoming three weeks of leave.

In a letter to Santoro dated July 28, 1981, Shidaker accused Charles Fargo, a full-time clerk in Kenilworth, of falsifying time cards, falsifying mail volume reports and writing a partially obscene letter during work time. When Postal Inspectors investigated, Shidaker could produce no records or other evidence of such falsifications although such falsifications are felonies under federal law.

Nonetheless, Shidaker told the inspectors that Fargo also had misused a "penalty indicia" Postal Service envelope in connection with the later. When the Postal Inspectors indicated that they would question Fargo, Shidaker then said that her accusations were intended only to oppose Fargo's elevation to the position of acting supervisor, Kenilworth. Although Shidaker was repeatedly instructed to take corrective actions against employee Montoya, who actually wrote the letter and misused the penalty envelope, she refused to do so. Misuse of a penalty envelope is a federal crime.

Shidaker also complains that after she answered charges made against her by Santoro, Santoro responded to his higher authority without sending her a copy of his response to her answer. Any procedural error committed by not sending her a copy of Santoro's response was cured by the fact that the entire administrative record was available to Shidaker when the matter was heard by the appointed hearing officer.

The Court finds that there is substantial evidence in the record to support the finding of the Postal Service that Shidaker was not reduced from Postmaster PES–18 to full-time distribution clerk, PES–5, step 12 in reprisal for filing the April 28, 1978 EEO complaint. The reduction was the result of Shidaker's misconduct and poor work performance, as specified in the proposed notice to reduce her from postmaster to clerk

and set forth in the above Findings of Fact. Therefore, the decision to reduce Shidaker in grade was neither arbitrary nor capricious.

IT IS THEREFORE found that

(1) Shidaker has failed to prove sexual discrimination in promotion by either a disparate impact or disparate treatment theory.

(2) There is substantial evidence in the administrative record to support the finding of the Postal Service that Shidaker was demoted in grade for misfeasance and malfeasance and not in retaliation for pursuing her civil rights claim.

(3) The Court finds the issues in favor of the Postal Service and against Darlene Shidaker. Accordingly, the complaint is dismissed with prejudice.